**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: October 4 2018**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 17-31687 |
| | ) | |
| Matthew David Pierson, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 17-3096 |
| | ) | |
| Matthew David Pierson, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Navient, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on pro se Plaintiff/Debtor Matthew David Pierson's complaint against Defendant Educational Credit Management Corporation ("ECMC") seeking a discharge of student loan debt as an undue hardship.[1]

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7

---

[1] On January 6, 2018, the court dismissed Navient as a defendant in this proceeding. [Doc. # 21].

of the United States District Court for the Northern District of Ohio. Proceedings to determine the dischargeability of debts are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witness, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff's student loan debt should be discharged as an undue hardship.

## FINDINGS OF FACT

### I. Plaintiff's Student Loans

Between January 1996 and September 1997, Plaintiff executed student loan notes to finance his education at Owens Community College. [Jt. Ex. 5]. The total amount disbursed to Plaintiff was $15,011.00. [Jt. Ex. 7]. Defendant ECMC has been the holder of those notes since November 2008. [*See* Jt. Ex. 8, p. 16]. According to Plaintiff, at least twice in the years before that time, his income tax refunds of approximately $4,000.00 each were garnished by a prior holder of the notes.

ECMC began garnishing Plaintiff's wages in 2014. Also in 2014, Plaintiff made arrangements to make additional monthly, and at times biweekly, student loan payments of $5.00. Plaintiff's payments, together with his garnished wages, total $1,502.92. [*See* Ex. 8]. By letter dated October 27, 2016, ECMC informed Plaintiff that he had met his obligations under a "Loan Rehabilitation Program" and that his loans would be placed into a standard ten-year repayment plan. [Jt. Ex. 15]. Plaintiff then applied for and was granted a forbearance through April 23, 2017, due to financial hardship. [Jt. Ex. 12, pp. 1 & 3]. However, in the meantime, at Plaintiff's request, his loans were placed in the Income Based Repayment plan ("IBR"), effective for twelve months beginning on March 23, 2017. [Jt. Ex. 11]. His monthly IBR payment for that twelve-month period was zero. [*Id.*]. Participation in the IBR can be renewed annually by submitting documentation regarding income and family size. [*Id.*].

ECMC's records show that the total amount owing on Plaintiff's loans as of February 22, 2018, was $15,053.06, including a principal balance of $14,800.18 and $172.88 in interest. There is a variable interest rate on the loans, with a per diem interest of $1.66 currently accruing. [Jt. Ex. 7].

### II. Plaintiff's Education and Work History

Plaintiff attended Owens Community College ("Owens") for six semesters between 1993 and 1998,

studying automotive repair. He did not complete his degree. He dropped out of school in the Fall of 1994 due to his struggles with bi-polar manic-depressive disorder and during which time, as discussed below, he was receiving Social Security total disability benefits. He returned to school in 1996. However, in 1998, he failed a reading class. After he failed the reading class, Plaintiff no longer qualified for the student loan he had obtained for that semester and Owens returned to the lender the funds it had received on Plaintiff's behalf. Plaintiff testified that he then owed Owens a debt that he could not pay, and he was unable to continue his education at Owens.

Plaintiff is now 47 years old. As stated above, he suffers from a bi-polar manic depressive disorder. He has difficulty concentrating and has certain learning disabilities that cause difficulty with reading and writing. At trial, Plaintiff credibly needed and the court allowed reading assistance from a family member. The Social Security Administration determined that he was disabled due to these conditions and that he was entitled to disability benefits as of March 1990. [*See* Jt. Ex. 24]. With the exception of $4,129.00 earned between 1990 and 2000, the disability benefit was his only source of income. [*See id.* at 1,5]. Those benefits were suspended in 2002 due to work activity and terminated in 2005 due to continued work. [*Id.* at 1].

In 2004, Plaintiff had moved to California and obtained a property maintenance job where he earned $33,533. [*See* Jt. Ex. 24, p. 5]. The court credits Plaintiff's testimony that, although this is more than he had ever earned in his life, the cost of living in California, and in particular, housing, utilities and food, were so high that he could not even afford car insurance let alone payments on his student loans. He was laid off from the property maintenance job for two years, during which time Plaintiff testified he "lived in his car" and, for some period of time, worked at a 7-Eleven convenience store. At some time in 2006, Plaintiff returned to the property maintenance job, earning $36,474 in 2007 and $29,568 in 2008. After 2008, Plaintiff was again laid off after the property maintenance company lost the customer contract under which it was operating.

At some point, Plaintiff moved back to Toledo, Ohio, where he now lives. In addition to the property maintenance job, Plaintiff has been employed in auto parts and grocery stocking positions, doing yard work and lawn care, and as a cashier. He recently was employed at a 7-Eleven store for approximately five years as a sales associate, working the night shift and earning $10.21 per hour after receiving raises over the previous four years. Plaintiff's annual income during his employment at 7-Eleven ranged from $14,700 to $16,985. Although Plaintiff sought a management position at 7-Eleven, he was unsuccessful. Plaintiff's employment at 7-Eleven was terminated on January 24, 2018. The reason for termination as stated by 7-Eleven and contested by Plaintiff was "Restricted Sales Violation." [Jt. Ex. 20]. Plaintiff testified that the

3

7-Eleven store had been sold and that he would have been entitled to a severance check at the end of January and that 7-Eleven's stated reason for firing him was a pretense to avoid the severance payment.

Plaintiff is currently working at Fed Ex as a package handler, a position he obtained in early April 2018. He works twenty hours per week - a four-hour shift, five days per week - loading boxes on to a truck. Plaintiff testified that the job is very physically intensive and that it requires him to be able to lift fifty to sixty pound boxes and load a truck within four hours. Having observed Plaintiff's slight build, the court credits his testimony that he is not able to work two four hour shifts a day at this job. Plaintiff earns $12.86 per hour at Fed Ex, with weekly income after taxes of approximately $215.00. [*See* Jt. Ex. 28, unnumbered p.4]. Plaintiff testified that he has been looking for a second part-time job and has applied at Meijer, Target, Walmart, Jeep, Dana, Powertrain and at a car lot, so far unsuccessfully.

### III. Plaintiff's Family and Financial Circumstances

Plaintiff is recently married and has a thirteen year old stepson who lives with him. Plaintiff's wife did not graduate from high school. She advertises daily online for work cleaning houses and earns approximately $230.00 per month cleaning empty trailers in the mobile home park where they live. She receives no child support as she shares joint custody with her ex-husband. As discussed above, Plaintiff's current net income is approximately $215.00 per week, or approximately $931.00 per month. Their current household income is thus approximately $1,161.00 per month.

During the past five years, Plaintiff's annual income has ranged from $3,324.00 to $20,468.00. [Jt. Ex. 17]. In the last four years, Plaintiff has received income tax refunds averaging approximately $4,400.00, as a result of the earned income credit and child tax credit and which he testified he has used to make up for budget shortages throughout the year. Most recently, he used his 2017 income tax refund as a down payment on his 2013 Ford Focus. Plaintiff surrendered his 2013 Dodge Dart after filing his bankruptcy petition and purchased the Ford Focus, which resulted in a $50.00 decrease in his car payment.

Plaintiff, his wife and his stepson live in a mobile home that Plaintiff testified he purchased for $1.00. Their home has no functioning furnace and stove. They heat their home with four portable electric heaters and a kerosene heater and use two hot plates for cooking. While they have generated an electric bill totaling approximately $4,000.00, they are enrolled in Ohio's Percentage of Income Payment Plan ("PIPP") that currently requires them to pay only $95.00 per month in order to avoid their electrical service being turned off. [*See* Jt. Ex. 28, unnumbered p. 13]. Other assistance with utilities that they receive on application with the Home Energy Assistance Program is a one-time $185.00 payment to Columbia Gas, which they can apply for annually and assists in payment of gas used to heat Plaintiff's hot water tank. [*Id.*

4

at 14].

Plaintiff's current household expenses have been decreased by over $300.00 since filing his bankruptcy petition. His itemized expenses include, among other things, $435.00 for the mobile home lot rental, a $250.00 car payment for his 2013 Ford Focus, $141.00 for car insurance and only $15.00 for clothing. [Jt. Ex. 28, unnumbered p. 6]. His expenses also include an $80.00 cell phone expense, which Plaintiff testified will be reduced by $40.00, as he is discontinuing his cell phone since he no longer needs one for work and is maintaining only his wife's cell phone. His expenses include a $100.00 internet expense, which Plaintiff explained is necessary for his wife to advertise her house cleaning services and for him to apply for jobs. These expenses, together with utilities, mobile home taxes, gasoline, kerosene, and other minimal household expenses total $1,761.00. [*Id.*]. Significantly, his itemized expenses include no food expense, presumably because he receives a food stamp benefit in the amount of $500.00. [*See id.*]. Nor do his expenses include any homeowner insurance or health insurance expense. [*Id.*]. Plaintiff testified that his wife and stepson have Medicaid coverage but that he has had no medical insurance since 2005. Plaintiff's monthly expenses also include no medical, dental or recreation expense. [*Id.*].

Plaintiff has no assets of appreciable value. [*See* Jt. Ex. 2, pp. 11-20/74]. He has no retirement savings and his estimated Social Security benefit at full retirement (age 67) is $1,252 per month. [Jt. Ex. 24, p. 6].

Before Plaintiff purchased his mobile home, he lived in a home from which he was evicted and after which the landlord obtained an $8,000.00 judgment against him. The landlord began garnishing his wages on April 27, 2017, [*see* Jt. Ex. 2, p. 47/74], and Plaintiff filed his Chapter 7 bankruptcy petition on May 26, 2017. His bankruptcy schedules filed in this case and the evidence at trial show total unsecured debt in the amount of $26,734.26, which includes the unsecured portion of a debt secured by Debtor's 2013 Dodge Dart that he surrendered after commencement of the case and student loan debt in the amount of $14,819.06.

Plaintiff now seeks discharge of his student loan debt, stating that even with the IBR, "I will never get out from under this debt." When asked how his circumstances would be any different if his student loan debt is discharged, Plaintiff testified that his income to debt ratio would improve and he may be able to qualify for a home loan, allowing him to purchase a home and prepare for his retirement years.

## LAW AND ANALYSIS

Plaintiff seeks to discharge his student loan debt based upon the "undue hardship" exception to nondischargeability of such debt under 11 U.S.C. § 523(a)(8). Section 523(a)(8) provides for the dischargeability of a student loan obligation if "excepting such debt from discharge . . . will impose an

5

undue hardship on the debtor and the debtor's dependents. . . ." The underlying purpose of this provision was "to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 436-37 (6th Cir. 1998).

Although the Bankruptcy Code does not define "undue hardship," the Sixth Circuit has adopted the test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987), for determining the existence of "*undue* hardship." *See Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2005).

Under the *Brunner* test, the debtor must prove each of the following three elements:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 385 (quoting *Brunner*, 831 F.2d at 396). A debtor seeking an undue hardship discharge bears the burden of proof on each of these three elements by a preponderance of the evidence. *Chime v. Suntech Student Loan (In re Chime)*, 296 B.R. 439, 443 (Bankr. N.D. Ohio 2003).

**I. First Prong of the Brunner Test**

The first prong of the *Brunner* test contemplates that a debtor is first entitled to provide for basic needs for food, clothing, shelter, medical care and transportation for himself and his dependents, if any, before repaying student loan debts. In applying this test, the court must evaluate a debtor's household income and expenses, focusing particularly on what expenses are necessary to realistically maintain a basic standard of living and then determining whether there is income left over with which to pay student loan debts.

Plaintiff has satisfied his burden with respect to this prong. His total household net income is only $1,161.00 per month or $13,932.00 per year, well below the 2018 Department of Health and Human Services Poverty Guidelines figure of $20,780.00 for a family/household size of three. *See* 83 Fed. Reg. 2642, 2643 (Jan. 18, 2018). ECMC does not dispute the fact that Plaintiff has minimized his expenses, which total $1,761.00, and has a minimal standard of living. Plaintiff's home is lacking basic amenities such as a functioning furnace and stove. He has medical problems and no health insurance or resources with which to pay medical and dental bills. He wore his only nice shirt to court. There is no question that, at his current level of household income, Plaintiff cannot make payments on his student loans and maintain

6

a minimal standard of living. Plaintiff is living in poverty.

Nevertheless, ECMC emphasizes that Plaintiff was enrolled in the administrative IBR plan, which required that no monthly payment be made on his student loans. [*See* Joint Ex. 13, pp. 4,7]; 34 C.F.R. § 682.215. How, ECMC argues, can Plaintiff's student loans be an undue hardship to him when no payment on them is required?

Factual scenarios regarding participation in the various administrative income- driven student loan repayment plans have typically been raised by lenders and addressed by courts under the third prong of the *Brunner* test regarding a debtor's good faith efforts to repay. So far the circuit courts of appeal that have addressed administrative income-driven repayment plans under the *Brunner* test have done so under the third prong. *See* John Patrick Hunt, *Help or Hardship?: Income-Driven Repayment in Student-Loan Bankruptcies*, 106 Geo. L.J. 1287, 1326-27, n. 296 (2018)(citing cases). Where, as here, a debtor is participating or has participated in an administrative program and the income-driven payment amount is zero, there has been a noticeable lender shift toward asserting the impact of such participation under the first prong of the *Brunner* test. In the Sixth Circuit, as addressed further below, the decision in *Barrett v. Educational Credit Management Corporation*, 487 F.3d 353 (6th Cir. 2007), drives that shift.

ECMC cites *In re Markwood*, Adv. No. 14-ap-04, 2014 WL 5573437 (Bankr. N.D. W.Va. Oct. 31, 2014), in support of its argument that since no payment is required, participation in the IBR plan has no impact on Plaintiff's standard of living and no undue hardship can be found. Other decisions reach the same conclusion. *See e.g., In re Greene*, 484 B.R. 98, 110-120 (Bankr. E.D. Va. 2012)(discussing cases), aff'd No. 4:13cv79, 2013 WL 5503086 (E.D. Va. Oct. 2, 2013), aff'd 573 F. App'x 300 (4th Cir. June 2, 2014).[2]

The court is not persuaded by ECMC's IBR argument as applied to Plaintiff. ECMC's argument does not address the issue that the *Brunner* test specifically requires the court to determine, that is, whether the debtor can maintain, based on his current income and expenses, a minimal standard of living "*if forced to repay* his student loans," which he has been on occasion. *Barrett*, 487 F.3d at 359 (citing *Brunner*, 831 F.2d at 396); *see also Reagan v. Educ. Credit Mgmt. Corp.*, 587 B.R. 296, 303 (Bankr. W.D. Pa. 2018) (rejecting on summary judgment ECMC's argument that the first prong of the *Brunner* test cannot be satisfied where debtor has a zero-dollar payment under the IBR plan); *Coatney v. U.S. Dep't of Educ. (In*

---

[2] West Virginia (*Markwood*) and Virginia (*Greene*) are in the Fourth Circuit. The Fourth Circuit Court of Appeals, with its decision in *Frushour v. Educational Credit Management Corp. (In re Frushour)*, 433 F.3d 393 (4th Cir. 2005), has been described as exemplifying the "anti-fresh-start courts" in deciding how much weight the fresh start policy should be given in the undue hardship analysis under § 523(a)(8). Hunt, 106 Geo. L.J. at 1319-20. The same commentator describes the Sixth Circuit Court of Appeals, with its decision in *Barrett*, as exemplifying pro-fresh start courts in weighing policies under § 523(a)(8). *Id.*

*re Coatney)*, 345 B.R. 905, 909 (Bankr. C.D. Ill. 2006) ("The United States argues that the Debtor cannot establish any present financial hardship because his payments are zero under the [the Income Contingent Repayment Plan]. That is not the *Roberson* test. The test is whether the Debtor's current financial condition precludes him from maintaining a minimal standard of living *if* forced to repay his student loan. This question can only be answered in the affirmative."); *Thomsen v. Dept. of Educ. (In re Thomsen)*, 234 B.R. 506, 512 (Bankr. D. Mont. 1999) (even though monthly payment would be zero under the Income Contingent Repayment Plan, the first Brunner prong "requires simply that the Debtors show they cannot repay the loans and maintain a minimal standard of living").

Participation in the IBR is neither automatic nor permanent. It requires administrative effort by both the borrower, [Joint Exs. 10, 11, 13, 15]; 34 C.F.R. § 682.215(e), and the loan holder, [Joint Ex. 14]; *id.*, over an extended period of time, approximately 22 more years for Plaintiff at this point. Given Plaintiff's current tenuous living conditions in a trailer he bought for $1 (after an eviction) and his depression and reading limitations, and having experienced living out of his car, annual administrative compliance cannot be shrugged off as no big deal and taken for granted as a burden on a debtor like him. *Local Loan v Hunt*, 292 U.S. 234, 244(1934)(a benefit to the debtor of the fresh start policy is having "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt"). Indeed Plaintiff was told that his participation in the IBR ended in February 2018. He did not re-apply, and was told that he could not at that time because of the instant court proceeding.

ECMC is, in essence, advancing a per se rule that there can never be a discharge based on undue hardship if the debtor has participated in, and continues to be eligible for, an IBR plan that requires a zero monthly payment. Refusing to " jump the logical chasm necessary to conclude that no payment constitutes repayment," one court persuasively explained that "[p]articipation in such a 'repayment' program in which the Plaintiff's monthly payment is zero is not repayment at all; rather, the loan continues to accrue interest on the principal without any repayment. At the end of the twenty–five year period, the Plaintiff's loans may be forgiven, but that amount, on which interest has been accruing, may become taxable as income." *Nightingale v. N.C. State Educ. Assistance Auth. (In re Nightingale*), 529 B.R. 641, 650 (Bankr. M.D.N.C. 2015) (addressing a similar student loan repayment plan under the William D. Ford Program); *see* 26 U.S.C. § 61(a)(11) (defining gross income to include income from discharge of indebtedness); 26 U.S.C. § 108(a) and (f) (addressing limited circumstances under which gross income will not include discharge of student loan debt). The court in *Nightingale* noted that qualifying for a zero repayment amount "certainly indicates difficult financial conditions for an individual debtor" and that "accepting the concept of a zero payment

8

as constituting 'repayment' effectively eliminates the hardship discharge provision for student loans for those most likely to be entitled to it." *Id.* at 649, 650. In this case, the evidence shows that the principal balance of Plaintiff's loans has increased as unpaid interest is added to the principal, even as he participated in the IBR. [Joint Ex. 7,8 (p. 15-16) ]. And when payments were made, the evidence shows that none of them ever reduced principal.

The Sixth Circuit Court of Appeals rejected in *Barrett* a similar argument advanced by ECMC, albeit in the context of good faith under the third prong of the *Brunner* test. In *Barrett*, ECMC argued that the third prong was not satisfied because the debtor had refused to enroll in the similar Income Contingent Repayment Program ("ICRP"). The court rejected ECMC's argument, stating that it "would create a per se rule requiring enrollment in the ICRP to satisfy the third *Brunner* prong and would, in effect, eliminate the discharge of student loans for undue hardship from the Bankruptcy Code." *Barrett,* 487 F.3d at 364. The court further explained:

> Congress recently enacted "the most sweeping reform of bankruptcy law since the enactment of the Bankruptcy Code in 1978." Michael & Phelps, *supra*, at 77-78; see also Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (codified in various sections of 11 U.S.C.). Yet Congress left § 523(a)(8)'s "undue hardship" language intact. Had Congress intended participation in the ICRP-implemented in 1994-to effectively repeal discharge under § 523(a)(8), it could have done so. In addition, requiring enrollment in the ICRP runs counter to the Bankruptcy Code's aim in providing debtors a "fresh start." The debtor is encumbered with the debt for an additional twenty-five years, regardless of the length of the student loans. If, at the end of the twenty-five years, the debtor has been unable to repay all the student loans, the remaining debt is canceled and that discharge of indebtedness is treated as taxable income. *See* Michael & Phelps, *supra*, at 105. The result, as the bankruptcy court noted, would be that Barrett would "be trading one nondischargeable debt for another."

*Id.* The court found that "the decision to forgo the ICRP is not a per se indication of a lack of good faith" but is merely probative of a debtor's intent to repay his loans. *Id.*

ECMC tries to distinguish *Barrett* by arguing that, unlike Plaintiff who was already enrolled in the IBR program, the debtor in *Barrett* had refused to apply for the ICRP option. The court finds the argument that a discharge should be denied where a debtor was already enrolled in the IBR program to be the flip-side of the same argument presented and rejected in *Barrett*. While *Barrett* addressed the issue in the context of the debtor's good faith effort to repay his loans, its reasoning parallels the reasoning in *Nightingale* that if participating in a zero payment plan automatically precludes a finding in favor of the debtor under the first *Brunner* prong, the hardship discharge provision for student loans would be effectively eliminated for those most likely to be entitled to it. *Nightingale,* 529 B.R. at 649, 650. The court finds this reasoning

9

persuasive.

The court finds that, given his circumstances, Plaintiff has met the first prong of the *Brunner* test notwithstanding his participation in the IBR at a zero monthly payment requirement.

## II. Second Prong of the Brunner Test

Under the second prong of the *Brunner* test, a debtor's financial adversity is required to be more than a temporary state of affairs. *Hatfield v. William D. Ford Federal Direct Consolidation Program (In re Hatfield)*, 257 B.R. 575, 582 (Bankr. D. Mont. 2000); *see also Hornsby*, 144 F.3d at 437 ("Courts universally require more than temporary financial adversity. . ."). Implicit in the requirement that a debtor's state of affairs is likely to persist for a significant portion of the repayment period is that the debtor's financial state be the result of events which are clearly out of the debtor's control. *Kirchhofer v. Direct Loans (In re Kirchhofer)*, 278 B.R. 162, 167 (Bankr. N.D. Ohio 2002). Thus, the debtor must establish that he has taken all steps possible to improve his financial situation. *Id.* The purpose of this requirement is to give effect to the clear congressional intent – exhibited by the use of the word "undue" in § 523(a)(8) – that a student loan obligation requires more than ordinary hardship before it will be discharged. *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088-89 (9th Cir. 2001).

The court finds that Plaintiff's circumstances demonstrate by a preponderance of the evidence more than a present inability to meet his student loan obligations. His future earning potential is limited. Other than the property maintenance job in California, Plaintiff's gross income has never exceeded $16,985.00. While his gross income was higher for three of the years he spent in California, the court does not believe that is indicative of his future earning potential, as shown by his testimony regarding other jobs that he has held, including yard work and lawn care, auto parts and grocery stocking positions, cashier and sales associate at 7-Eleven stores. After failing a reading class approximately twenty years ago, he was not able to complete his post-secondary education as he could not pay the debt owed to Owens after it returned student loan funds it had received on Plaintiff's behalf and for which Plaintiff was no longer eligible.

Notwithstanding Plaintiff's struggles with his learning disabilities and bi-polar manic depressive disorder, he has persevered in looking for and working at whatever jobs he could obtain. Soon after losing his job at the 7-Eleven store, he began working as a package handler at Fed Ex. Given Plaintiff's age, his testimony regarding the strenuous physical demands of that job and having observed Plaintiff at trial, as indicated earlier, the court credits his testimony that he is not able to work two four-hour shifts a day as a package handler at Fed Ex. Plaintiff is actively seeking another part-time job.

ECMC pursued a line of questioning of Plaintiff--one that greatly upset him–suggesting that Plaintiff

could (and should) maximize his income by moving to Elkhart, Indiana or the like to build recreational vehicles or back to California, where he earned the most he ever earned in his life. This argument implicates both the second and third prongs of the *Brunner* test. As Plaintiff aptly summed up the problems with such a demand: "I wouldn't have a wife." His home (such as it is) and his support systems are in the Toledo metropolitan area; this is not a random place to him. And while Plaintiff's California income was higher than he has ever earned in Toledo, so were his expenses. He ended up living out of his car while there. That move was also driven by other difficult family issues, which Plaintiff struggled to address. The court rejects that the *Brunner* test of undue hardship under § 523(a)(8) requires Plaintiff to leave the Toledo metropolitan area at this time to find work. He is not acting unreasonably or unfairly to his student loan holder by continuing to make and try to build a life in Toledo.

While it is impossible to predict exactly what the future holds for Plaintiff, the court assumes he will be successful in obtaining a second part-time position. In making a determination under the second prong of *Brunner*, the court assumes additional net income equal to what Plaintiff is now earning, which is $931.00 per month.[3] This, together with the $1,161.00 current monthly household net income, would result in monthly income of $2,092.00. This increase in income less Plaintiff's current monthly expenses of $1,761.00, would leave a balance of $331.00. While an improvement over his current financial circumstances, the court must still consider realistic expenses and Plaintiff's resulting ability to pay on his student loans.

Assuming additional net income of $931, the $500.00 food assistance benefit that Plaintiff currently receives will likely be significantly reduced or eliminated. That alone will more than consume the $331.00 balance that would be available after paying his current monthly expenses. And as noted earlier, Plaintiff's current monthly expenses include no food, medical, dental or recreation expense and only $15.00 per month as a clothing expense, which is an unrealistically low figure for a family of three. Although Plaintiff has received significant income tax refunds of approximately $4,000.00, Plaintiff reasonably and necessarily uses those funds to make up for his budget deficits. The family also desperately needs a working stove and safe and reliable heating for the mobile home. On these facts, the court finds that even considering additional income Plaintiff might earn from a second part-time job, he will not be able to maintain a minimal standard of living if forced to repay his student loans. The court further finds that Plaintiff's age, limited education and skill set, his learning disabilities and bi-polar disorder, and his limited future earning potential

---

[3] The court notes that this assumption would result in $1,862.00 of net monthly income, or $22,344.00 of net annual income, an amount that significantly exceeds his annual income earned in the past six years. [*See* Jt. Ex. 24, p. 5].

are additional circumstances indicating financial adversity that is likely to persist throughout a 25-year repayment period and that will not permit him to pay on his student loans while maintaining a minimal standard of living. Plaintiff has met his burden on the second prong of the *Brunner* test.

**III. Third Prong of the Brunner Test**

Under the third prong of the *Brunner* test, a debtor must demonstrate that he has made a good faith effort to repay the loans. The good faith requirement does not mandate that payments must have been made when the debtor's circumstances made such payment impossible. *See Alston v. U.S. Dept. of Educ. (In re Alston)*, 297 B.R. 410, 414 (Bankr. E.D. Pa.2003); *Grove v. Educ. Credit Mgmt. Corp. (In re Grove)*, 323 B.R. 216, 226 (Bankr. N.D. Ohio 2005) (explaining that "a debtor might establish good faith in the absence of any payments by demonstrating that the circumstances are so dire and the future outlook so bleak that nothing short of an immediate discharge of the debt will avoid an undue hardship on the debtor or the debtor's dependents"). As one court explained, the good faith standard is really a question of overall good faith in regard to the student loan, and the good faith analysis is driven by the totality of the circumstances. *Afflitto v. United States (In re Afflitto)*, 273 B.R. 162, 171 (Bankr. W.D. Tenn. 2001). Factors courts typically consider in this analysis include the following:

> (1) whether debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;
> (2) whether debtor has realistically used all available financial resources to repay the debt:
> (3) whether debtor is using [his] best efforts to maximize earning potential;
> (4) the length of time after the loan first becomes due after debtor seeks to discharge the debt;
> (5) the percentage of student loan debt in relation to debtor's total indebtedness;

*Flores v. U.S. Dept. of Educ. (In re Flores)*, 282 B.R. 847, 856 (Bankr. N.D. Ohio 2002).

In this case, Plaintiff's inability to repay his student loans is not the result of any factor reasonably within his control. He has consistently sought out stable employment and continues to seek an additional part-time position to supplement his income. Nevertheless, even with the income that an additional part-time position is likely to provide, Plaintiff's household income still will not provide for some of his family's basic needs, such as a furnace, stove, out of pocket medical and dental expenses. Notwithstanding his dire financial circumstances, Plaintiff began making monthly $5.00 payments in addition to his wages being garnished and met his obligations under a Loan Rehabilitation Program.

He also used administrative remedies, including requesting a forbearance due to financial hardship and participation in the IBR plan. For the reasons discussed earlier in this opinion, the court finds Plaintiff's decision now not to continue in the IBR plan does not indicate an inherent lack of good faith.

*See Barrett*, 487 F.3d at 364 (finding "the decision to forgo the ICRP is not a per se indication of a lack of good faith" but is merely probative of a debtor's intent to repay his loans); *Cota v. U.S. Dept. of Educ.*, 298 B.R. 408, 421 n.16 (Bankr. D. Ariz. 2003) ("The logic of applying for a program that allows the debtor a $0 'payment' as a precondition to a finding of a debtor's good faith, is lost on the court.").

This is also not a case in which a debtor is seeking a discharge of student loan debt when on the verge of reaping the benefit of his education. Plaintiff filed his petition nearly twenty years after attending college. And although his student loan debt constitutes approximately fifty-five percent of his unsecured debt, the court does not find that to be a significant fact in its good faith determination. The court credits Plaintiff's testimony that the original purpose of filing bankruptcy was to address a judgment obtained against him by his former landlord in the amount of approximately $8,000.00 and the crippling wage garnishments that ensued. Plaintiff did testify that discharge of his student loan debt would improve his chance of being able to purchase a home and prepare for his retirement; however, his testimony was simply in response to a question regarding how his circumstance would be different if the debt was discharged. *See Segal v. Rochelle*, 382 U.S. 375, 379 (1966)(one legislative purpose of the fresh start is 'to leave the bankrupt free after the date of the petition to accumulate new wealth in the future"). While the ability to substitute one debt for another is perhaps not a valid basis for seeking discharge of a student loan debt, given Plaintiff's earning potential, the court finds that dream to be an unlikely outcome in this case. In any event, Plaintiff also testified that he would "never be able to get out from under this debt," which the court finds is the true basis for him seeking a discharge of the student loan debt. The court finds that Plaintiff has demonstrated good faith.

For all of the foregoing reasons, the court finds that Plaintiff has demonstrated an undue hardship under § 523(a)(8) by meeting his burden of proof under all three prongs of the *Brunner* test. The court will enter a separate judgment in accordance with this Memorandum of Decision.

###